UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| DAVID LASH, SR. and <br> DAVID LASH, JR., <br><br> Plaintiff(s), <br><br> vs. <br><br> MICHAEL HOLLIS, et al., <br><br> Defendant(s). | Case No. 2:05CV32 JCH |

## MEMORANDUM AND ORDER

This matter is before the Court upon Defendants' *Daubert* Motion to Exclude Expert Opinions and Testimony of Christopher Long ("Defendants' Motion to Exclude"), filed October 20, 2006. (Doc. No. 80). The motion is fully briefed and ready for disposition.

## BACKGROUND

By way of background, Plaintiffs David Lash, Sr. ("Lash, Sr."), and David Lash, Jr. ("Lash, Jr."), are citizens of the State of Missouri, and residents of Randolph County, Missouri. (First Amended Complaint ("Complaint" or "Compl."), ¶¶ 1, 2). Defendants Michael Hollis ("Hollis"), Adam Swon ("Swon"), Anthony Bowne ("Bowne"), and John Kirkpatrick ("Kirkpatrick"), are citizens of the State of Missouri, and at all relevant times, were police officers employed by the City of Moberly, Missouri. (Compl., ¶ 3).

According to Plaintiffs, on or about December 30, 2004, Lash, Sr. suffered a job related injury that amputated approximately one quarter of his right index finger. (Compl., ¶ 13). On or about January 11, 2005, Lash, Sr. suffered an adverse reaction to medication he was taking. (Id., ¶ 14). At approximately 3:00 a.m. on January 11, 2005, Defendants Swon, Bowne, Hollis and Kirkpatrick

arrived at Lash, Sr.'s residence, where they found Lash, Jr. holding an incoherent Lash, Sr. on his stomach on the kitchen floor. (Id., ¶¶ 14, 15, 20).

According to Plaintiffs, when Lash, Sr. moved his shoulder to speak, Defendants Swon, Bowne, and Hollis utilized a Taser on both Lash, Sr. and Lash, Jr. (Compl., ¶ 16). After being Tasered once, Lash, Jr. released his father, and was restrained and handcuffed in another room. (Id.). Defendants continued to administer Taser shocks to Lash, Sr., however, and further kicked him in the groin and neck areas, re-injured his amputated finger, caused two of his upper front teeth to be dislodged from his jaw, and employed a stranglehold prohibited by the Moberly Police Department's Use of Force Policy. (Id., ¶¶ 18, 20). Lash, Sr. allegedly was rendered unconscious by the Taser blows and prohibited stranglehold. (Id., ¶ 21).

Lash, Sr. was transported by ambulance to a hospital, where he was found to suffer from rhabdomyolysis, acute renal failure, lactic acidosis, and skeletal trauma. (Compl., ¶ 22). Plaintiffs allege Lash, Sr. now suffers from permanent and debilitating injuries, as a direct result of Defendants' actions. (Id., ¶ 23).

Plaintiffs filed their First Amended Complaint in this matter on October 31, 2005. (Doc. No. 50). Counts I and II of Plaintiffs' Complaint are brought pursuant to 42 U.S.C. § 1983, for alleged violations of Plaintiffs' Fourth, Fifth, and Fourteenth Amendment rights. The remaining claims in Plaintiffs' Complaint are as follows: Battery of Lash, Sr. (Count III); Battery of Lash, Jr. (Count IV); and Intentional Infliction of Emotional Distress upon Lash, Jr. (Count V).

In support of their claims, Plaintiffs seek to introduce the testimony of their expert witness, Christopher Long, PhD ("Long"). If permitted, Long will offer opinions to rebut Defendants' experts' view that Lash, Sr.'s ingestion of an overdose of the prescription medication Gabitril led to his rhabdomyolysis and renal failure. Long further will opine it was the Taser stuns that caused Lash,

Sr.'s medical conditions. In their Motion to Exclude, Defendants maintain Long's opinions are inadmissible under both the Federal Rules of Evidence and the Supreme Court's ruling in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

**DISCUSSION**

**A.      Standard For Daubert Motions**

Under Eighth Circuit law, "[d]ecisions concerning the admission of expert testimony lie within the broad discretion of the trial court." Anderson v. Raymond Corp., 340 F.3d 520, 523 (8th Cir. 2003) (internal quotations and citation omitted). As a preliminary matter, "'[t]he proponent of the expert testimony must prove its admissibility by a preponderance of the evidence.'" Sappington v. Skyjack Inc., 446 F.Supp.2d 1059, 1061 (W.D. Mo. 2006), quoting Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). The starting point for analyzing expert testimony is Federal Rule of Evidence 702, which provides in relevant part as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Id.

Pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., the seminal case regarding expert opinion testimony, "district courts are to perform a 'gatekeeping' function and insure that proffered expert testimony is both relevant and reliable." Dancy v. Hyster Co., 127 F.3d 649, 652 (8th Cir. 1997) (citations omitted), cert. denied, 523 U.S. 1004 (1998); see also Daubert, 509 U.S. at 592-93.

> Daubert provides a number of nonexclusive factors a court can apply in performing this role: 1) whether the theory or technique can be (and has been) tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the theory has been generally accepted...Daubert's progeny provides additional factors such as: whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the

proposed expert sufficiently connected the proposed testimony with the facts of the case.

Sappington, 446 F.Supp.2d at 1062, quoting Lauzon, 270 F.3d at 686-87 (internal quotations and citations omitted).

**B.    Proffered Opinions**

    **1.    Long's Opinion Regarding Percocet Ingestion**

In his expert report, Long first opines that, "[t]he report of Percocet ingestion is inaccurate, as acetaminophen was not detected." (Long Report, attached to Defendants' Motion to Exclude as Exh. A, P. 2). Defendants do not attack Long's opinion in this regard, nor do they question his qualifications to render the opinion. (Brief in Support of Defendants' *Daubert* Motion to Exclude Expert Opinions and Testimony of Christopher Long ("Defendants' Memo in Support"), P. 4). Rather, Defendants maintain the opinion is irrelevant, because whether or not Lash, Sr. ingested Percocet has no bearing on Defendants' theory that an overdose of Gabitril lead to his rhabdomyolysis and subsequent renal failure. (Id., P. 5).

Upon consideration, the Court will allow this opinion. Specifically, the Court notes it was Defendants' expert witness, Dr. Michael Evans, who noted Lash, Sr.'s alleged ingestion of Percocet in his Toxicology Report. (See Toxicology Report, attached to Reply Brief in Support of Defendants' *Daubert* Motion to Exclude Expert Opinions and Testimony of Christopher Long as Exh. A, PP. 9, 19). Given Defendants' theory that Lash, Sr.'s rhabdomyolysis was caused by drug toxicity, rather than Taser stuns, the Court finds Long's opinion that a mistake was made in the reporting of Lash, Sr.'s drug intake to be relevant to the issues involved in this case. This portion of Defendants' Motion to Exclude must therefore be denied.

    **2.    Long's Opinions Regarding Gabitril Ingestion**

In his expert report, Long offers the following opinions regarding Lash, Sr.'s alleged ingestion of Gabitril:

> The report of Gabitril consumption is also in question. Firstly because it appears that it was the same source as the Percocet, which was inaccurate. Secondly, because Gabitril works as a sedative, on the benzodiazepine receptor, the reported behavior would not be expected (not [sic] is it reported). Thirdly, the report of "Hostility" in the PDR is 2% of the cases while the placebo resulted in 1% of the cases. This difference is not significant. Further, there is no objective evidence that Gabitril was even consumed (as in a drug test) by Mr. Lash, Sr. To draw conclusions, based upon what a bystander believes, is speculation. To assume that Mr. Lash was in a hyperkinetic state is also speculation, as mental confusion does not equate with hyperactivity or hyperthermia.

(Long Report, P. 2).

Defendants attack Long's opinions regarding Gabitril on several bases, including the following: (1) that Long admittedly did not review the depositions taken in this case; (2) that Long bases his opinions on studies conducted on patients ingesting small doses of Gabitril, rather than the large amount allegedly ingested by Lash, Sr.; and (3) that Long's opinion regarding hyperactivity is not supported by scientific evidence. (Defendants' Memo in Support, PP. 5-7).

Upon consideration, the Court will allow Long to offer his opinions regarding Lash, Sr.'s alleged ingestion of Gabitril. Upon review of the records before it, the Court finds questions remain with respect to how it was determined the pills ingested by Lash, Sr. were Gabitril, and how many pills Lash, Sr. actually ingested. Because Long's opinions may shed light on these issues, he will be permitted to testify thereon.[1]

### 3. **Long's Opinions Regarding The Effects Of Taser Stuns**

In his expert report, Long offers the following opinions regarding the alleged effects of Taser stuns on Lash, Sr.:

---

[1] Any alleged deficiencies in Long's methodology and/or conclusions may be brought to the jury's attention through vigorous cross-examination.

> The Tasar [sic] has been reported to produce increases in myoglobin (J.Ho, et al), even although these were single Tasar [sic] deployments. The repeated deployment of Tasar [sic] would only increase the myoglobin concentrations, as in Mr. Lash, and lead to rhabdomyolysis, as in Mr. Lash.
>
> Consequently, it is my opinion that Mr. Lash, Sr., suffered from the Tasar [sic] attacks producing the abnormally elevated myoglobin. This further resulted in the rhabdomyolysis and renal failure.

(Long Report, P. 2). According to Defendants, Long's opinions must be excluded, because he does not possess the qualifications necessary to render opinions on the effects of multiple Taser discharges on Lash, Sr. (Defendants' Memo in Support, P. 7). Specifically, Defendants note the following deficiencies in Long's qualifications and analysis:

> Dr. Long's opinion [regarding the effects of Taser stuns] is based solely on a couple of sentences from the above-referenced article.[2] Dr. Long is not familiar with the Taser used in this case, or the specific model that was used. (See [Long Deposition, attached to Defendants' Motion to Exclude as Exh. B], P. 42). Dr. Long does not know how the Taser was actually used in this case. (See Id. at p. 44-45). Until his deposition, Dr. Long did now [sic] know the Taser could be used in two (2) different ways. (See Id. at p. 45). Dr. Long does not know how a Taser operates. (See Id. at p. 43). Dr. Long does not know how many volts would be enough to cause rhabdomyolysis. (See Id. at p. 48). Dr. Long does not recall giving opinions regarding a Taser in any case in the past. (See Id. at p. 46). Finally, Dr. Long has only [seen] a Taser on television. (See Id. at p. 44). It is clear from Dr. Long's lack of experience with the Taser that he is not qualified to offer any opinions regarding its effect on Lash, Sr.

(Defendants' Memo in Support, PP. 7-8). Defendants continue to assert Long's theory that multiple Taser deployments would produce abnormally elevated myoglobin, which in turn would result in rhabdomyolysis and renal failure, has not been tested and does not enjoy widespread acceptance in the relevant scientific community. (Id., P. 8).

Upon consideration, the Court agrees Long is not qualified to testify as an expert witness regarding the effects of Taser deployments. He admittedly has familiarity with neither Tasers in

---

[2] Long apparently relied on the article *Cardiovascular and Physiologic Effects of Conducted Electrical Weapons Discharge in Resting Adults*, by J.Ho, et al.

general, nor the specific model and method of use involved in this case. Further, to reach his conclusions Long simply read one scholarly article on the effects of Tasers, and then attempted to extrapolate to fit the facts of this case. Long's proffered opinions thus have not been tested, nor have they been published and subjected to peer review. Under these circumstances, the Court finds Long's opinions regarding the effects of Taser stuns will not assist the trier of fact in understanding the evidence or determining the facts in issue, and thus they must be excluded.[3]

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' *Daubert* Motion to Exclude Expert Opinions and Testimony of Christopher Long (Doc. No. 80) is **GRANTED** in part and **DENIED** in part, in accordance with the foregoing.

Dated this 18th day of January, 2007.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE

---

[3] In their Motion to Exclude, Defendants finally assert Long's entire report must be excluded, for failure to comply with Federal Rule of Civil Procedure 26(a)(2)(B). (Defendants' Memo in Support, P. 9). While the Court disapproves of Plaintiffs' piecemeal method of compliance, at this late juncture it will not exclude Long's report on this basis alone.